UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EDWARD SCHULTZ | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:14-CV-400 SPM |
| | ) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the application of Plaintiff Edward Schultz ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 7). Because I find the decision denying benefits was not supported by substantial evidence, I will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

I.  **FACTUAL BACKGROUND**

Plaintiff was born in 1970. (Tr. 71). He has some college education in business management, and he has worked in the past as a manager of a video arcade. (Tr. 48-49). From October 2010 to January 2011, he was incarcerated in the St. Charles County Department of Corrections. (Tr. 159-64, 233).

1

At the hearing before the ALJ on March 5, 2013, Plaintiff testified that he cannot work because he cannot be around people. (Tr. 50). He does not engage in any social activities, does not see friends, does not talk on the phone, spends his days in dark areas, and does not go outside unless he has to go to the doctor. (Tr. 53-55). He has suicidal and homicidal thoughts once or twice a day, but he can calm himself down by taking lithium. (Tr. 55-56). He has had rages that lasted four hours or more, after which he becomes depressed and cannot move for a day or two. (Tr. 56-57). At the time of the hearing, Plaintiff had been on medication consistently for over six months. (Tr. 50-51).

While he was in jail between October 2010 and January 2011, Plaintiff received regular counseling sessions and was frequently found to have an angry or flat mood and a circumstantial thought process. (Tr. 234-239, 247-48). He was also treated for skin cancer while in jail. (Tr. 240-45). Plaintiff was released in January 2011. (Tr. 233). In August 2011, he began seeing a psychologist, David A. Lipsitz, Ph.D., who diagnosed him with bipolar disorder. (Tr. 352). Plaintiff continued receiving regular treatment from Dr. Lipsitz through at least early 2013. (Tr. 339-44, 352-53, 355-58, 381-96). In September 2012, Plaintiff began receiving treatment from a psychiatrist, Omar Quadri, M.D. (Tr. 406). Dr. Quadri treated Plaintiff with lithium and other medications through at least early 2013. (Tr. 406-22).

The record contains the following medical opinion evidence: a November 2011 residual functional capacity statement from Plaintiff's treating psychologist, Dr. Lipsitz, who found that Plaintiff had marked restrictions in social functioning and daily living and had poor or no ability to function in numerous areas required for work; an April 2011 psychological evaluation from a consultative examiner, David Peaco, Ph.D., who found that Plaintiff had severely impaired social functioning and a moderately impaired capacity to cope with the world around him (Tr. 257-58);

and an April 2011 report from a non-examining consultant, Dr. Robert Cottone, Ph.D., who found that Plaintiff had marked difficulties in maintaining social functioning and mild or moderate limitations in various areas but retained the ability to perform simple and light work away from peers and the public. (Tr. 267-73).

## II. PROCEDURAL BACKGROUND

On January 25, 2011, Plaintiff applied for SSI, alleging that he had been unable to work since December 28, 2010 due to skin cancer, conflict with his employer, and depression. (Tr. 159-64, 186, 196). His application was initially denied. (Tr. 71). On June 7, 2012, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 13). On September 21, 2012, Plaintiff amended his alleged onset date to August 2, 2011. (Tr. 178). After a hearing, the ALJ issued an unfavorable decision on April 11, 2013. (Tr. 13-23, 39-64). Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council on April 26, 2013, but the Council declined to review the case on January 8, 2014 (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a plaintiff must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The

impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e). At Step Four, the Commissioner determines whether the claimant can

return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since January 25, 2011, the application date; that Plaintiff had the severe impairments of a history of basal cell carcinoma, bipolar affective disorder, and obesity; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 15). The ALJ found that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c) except that he cannot understand, remember, and carry out detailed instructions on a sustained basis and should perform work that includes no more than infrequent handling of customer complaints. (Tr. 17). The ALJ found that Plaintiff is unable to

perform any past relevant work. Relying on the testimony of a vocational expert, the ALJ found that there are jobs that exist in the national economy that Plaintiff can perform, giving as examples warehouse worker, packaging, and medium production and assembly work. (Tr. 21-22). The ALJ therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since January 25, 2011, the date the application was filed. (Tr. 22).

## V. DISCUSSION

Plaintiff argues that the ALJ's decision should be reversed and remanded because the ALJ failed to adequately weigh the opinion of Plaintiff's treating psychologist, Dr. Lipsitz, in accordance with the requirements of 20 C.F.R. § 416.927. Plaintiff also appears to contend that several of the factors the ALJ considered in assessing Plaintiff's credibility were unsupported.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence on the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir.

2006)). "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ's Evaluation of Dr. Lipsitz's Opinion

Plaintiff's primary argument is that the ALJ failed to adequately evaluate the opinion of his treating psychologist, Dr. Lipsitz, and erred by giving "very little weight" to it.

On November 10, 2011, Plaintiff's treating psychologist, Dr. Lipsitz, completed an RFC statement in which he stated that Plaintiff had bipolar disorder and a Global Assessment of Functioning ("GAF") score of 45;[1] noted that Plaintiff had symptoms of depression, anger, fear, resentment, pervasive loss of interest, hostility and irritability, emotional mood manifestations, obsessions, and psychomotor agitation or retardation; and that Dr. Lipsitz had conducted a Minnesota Multiphasic Personality Inventory for Plaintiff. (Tr. 347). Dr. Lipsitz opined that Plaintiff's ability was "poor or none" in many mental abilities needed to do work, including working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along

---

[1] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV 32.

7

with coworkers without unduly distracting them or exhibiting behavioral extremes, responding appropriately to changes in a routine work setting, dealing with normal work stress, interacting appropriately with the general public, and maintaining socially appropriate behavior. He found that Plaintiff had marked restrictions in activities of daily living and marked difficulties in maintaining social functioning. (Tr. 348-49). Dr. Lipsitz was the only treating source to offer opinion evidence regarding Plaintiff's mental ability to function in the workplace.

"A treating [source]'s opinion is given controlling weight if it 'is well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 416.927(c)(2). If this standard is not satisfied, it "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2p, 1996 WL 374118, at *4 (July 2, 1996). "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]." *Id.* These factors include the length and frequency of the treatment relationship, the nature and extent of the treatment relationship, the evidence provided by the source in support of the opinion, the consistency of the opinion with the record as a whole, the level of specialization of the source, and other relevant factors. 20 C.F.R. § 416.927(c)(2)-(6). "When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so." *Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011); *see also* 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

As a preliminary matter, the Court will consider whether the RFC statement at issue was actually completed by Dr. Lipsitz, such that it is subject to the rules governing an ALJ's

evaluation of the opinion of a treating source. The ALJ suggested that the opinion might not have been Dr. Lipsitz's, referring to the opinion as one "allegedly provided by Dr. Lipsitz," and citing the fact that it was "not signed and dated" as a reason for discounting it.[2] In addition, the ALJ did not indicate that she was addressing Dr. Lipsitz's opinions under the regulations applicable to treating source opinions. However, the ALJ did not actually make a finding that Dr. Lipsitz had not completed the opinion, nor would such a finding be supported by substantial evidence in the record. The record shows that Plaintiff's attorney sent Dr. Lipsitz a letter requesting that he complete an RFC form and attached the form. On that letter, Dr. Lipsitz wrote the dates of treatment, diagnosis, prognosis, his signature, and the date (November 10, 2011). Immediately following that letter in the record is a completed RFC form that appears (to the undersigned) to be in the same handwriting as the writing on the letter. (Tr. 346-51). The form itself contains no specific space for a signature that was left blank, and it contains no indication that anyone other than Dr. Lipsitz completed it. If the ALJ did not feel she had sufficient evidence to determine whether Dr. Lipsitz was the author of the form, she could have permitted Plaintiff additional time to obtain a signature from its author or contacted Dr. Lipsitz herself. However, she did not do so, and the record as it currently stands supports only the conclusion that Dr. Lipsitz completed the form. Thus, it is subject to the rules governing opinions of treating sources.

After review of the record and the ALJ's decision, the Court cannot say that the ALJ properly applied the factors set forth in 20 C.F.R. § 416.927(c)(2) or that the ALJ gave good reasons for giving very little weight to Dr. Lipsitz's opinions. Although the ALJ offered several

---

[2] At the hearing, the ALJ noted that Dr. Lipsitz had signed the letter that Plaintiff's counsel had sent to him asking him to complete the RFC form, but that Dr. Lipsitz had not signed the form itself. (Tr. 47). She gave Plaintiff's counsel two weeks to get it signed. (Tr. 47). Plaintiff's counsel requested an extension of time to get the form signed, which the ALJ denied. (Tr. 220-21).

reasons for discounting Dr. Lipsitz's opinions, most of them are either unsupported by the record or do not provide a sufficient basis for the ALJ's decision to almost completely discount the opinions.

In explaining her evaluation of Dr. Lipsitz's opinion, the ALJ first stated, "Whether the claimant is disabled is a matter reserved to the Commissioner of Social Security (20 CFR 416.927(e))". (Tr. 20). Although this is correct, *see Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010), it is of little relevance in evaluating Dr. Lipsitz's opinion, which consisted of descriptions of specific limitations rather than an opinion that Plaintiff was "disabled." (Tr. 347-51).

Second, the ALJ noted that "the form is not signed and dated" even though she had "specifically request[ed] that the form be properly executed." (Tr. 20). As discussed above, the evidence in the record suggests Dr. Lipsitz completed the form. The fact that Dr. Lipsitz signed and dated only the cover letter and not the form itself is not a reasonable basis for discounting it.

Third, the ALJ noted that Dr. Lipsitz's records consisted of "largely the claimant's own reports of his complaints" and that "[t]here is nothing in any of the records in Exhibits 7F or 8F to support the mental residual functional capacity that was provided by Dr. Lipsitz at the request of the claimant's representative." It is unclear how the ALJ came to those conclusions. The Court finds the treatment notes in Exhibit 7F and 8F almost completely illegible. Although it is possible that the ALJ was able to read them and determine that their contents did not support Dr. Lipsitz's opinion, the ALJ did not so indicate in her decision. In addition, in his RFC statement and notes, Dr. Lipsitz indicated that he had performed a Minnesota Multiphasic Personality Inventory test and other psychological tests on Plaintiff. (Tr. 347, 352). Although the results of these tests do not appear to be part of the record, they do suggest that Dr. Lipsitz's opinion was

10

based on something more than Plaintiff's subjective complaints. It does not appear that the ALJ made any attempt to develop the record by obtaining the missing tests or clarifying the meaning of the illegible notes; instead, she seems simply to have assumed, without evidence, that they did not support the opinion offered.

Fourth, the ALJ noted that Dr. Lipsitz's own notes reflected that Plaintiff improved after he began taking medication, and that Dr. Lipsitz reported "that the claimant functioned with only minimal impairments on Lithium." Those statements are only partially consistent with the record. Dr. Lipsitz did report that Plaintiff was improving in late 2012 and early 2013, and he sometimes found that Plaintiff had GAF scores as high as 65 (indicating mild symptoms).[3] (Tr. 381-93). However, during that same time, Dr. Lipsitz also consistently found that Plaintiff's level of functioning was "3-serious impairment," with the other options being "1-unable to function" "5-moderate," "7-mild limitations," and "9-no impairment." (Tr. 381-93). He also consistently recorded (after 50-minute long sessions he had with Plaintiff roughly every two weeks) that Plaintiff had symptoms of depression, hopeless/helpless feelings, social isolation, anxious mood, irritability, hostility, and authority conflict. (Tr. 381-93). It is impossible to square these notes with the ALJ's conclusion that Dr. Lipsitz found that Plaintiff "functioned with only minimal impairments on Lithium." Instead, these notes are generally supportive of Dr. Lipsitz's opinions regarding Plaintiff's significant interpersonal limitations and limited ability to handle work stress. They do not provide a basis for the ALJ's decision to reject virtually all of

---

[3] A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* 32.

11

Dr. Lipsitz's opinions and impose no interpersonal limitations on Plaintiff aside from restricting him to infrequent handling of customer complaints.

Based on the above, the Court finds that the ALJ did not support her decision to give "very little weight" to Dr. Lipsitz's opinions with good reasons that were supported by substantial evidence in the record. Thus, the Court will remand the case for further proceedings. *See Anderson v. Barnhart*, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) ("Failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand"); *Clover v. Astrue*, No. 4:07CV574–DJS, 2008 WL 3890497, at *12 (E.D. Mo. Aug.19, 2008) ("Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand."); *Knebel v. Astrue*, No. C12-0015, 2014 WL 7384944 (N.D. Iowa Dec. 29, 2014) (remanding because "the ALJ failed to give 'good reasons' for rejecting" treating source opinions); 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). On remand, the ALJ should make it clear that she is applying the appropriate standard to Dr. Lipsitz's treating source opinion; should re-evaluate Dr. Lipsitz's opinion and subsequent treatment notes in light of the factors outlined in 20 C.F.R. § 416.927(c); and should support her findings with evidence from the record. To make this assessment, the ALJ may find it necessary to develop the record further regarding Dr. Lipsitz's illegible treatment notes and/or the objective testing that appears to be missing from the current record.

### C. The ALJ's Credibility Analysis

Although Plaintiff does not include a challenge to the credibility analysis in his enumerated list of issues, he does suggest in his brief that several of the statements made by the ALJ regarding Plaintiff's credibility were not supported by the record. (Doc. 12, at p.5). "Before

determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007). To do so, the ALJ considers: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the court] will normally defer to the ALJ's credibility determination." *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (internal quotation marks and citation omitted).

The Court recognizes that the ALJ's reconsideration of Dr. Lipsitz's opinion and treatment notes on remand, along with any additional evidence she may obtain, may alter her assessment of the credibility of Plaintiff's complaints. However, to minimize the possibility of multiple appeals and remands, the Court will address Plaintiff's specific arguments regarding the ALJ's credibility assessment.

First, the Court agrees with Plaintiff that the ALJ appears to have improperly drawn her own inferences from lab reports in concluding that Plaintiff was being untruthful regarding his medication compliance. (Tr. 19). The ALJ found that "[t]he most important document" in Plaintiff's first set of psychiatric records was a lab report of a blood test taken September 20, 2012 showing that Plaintiff's lithium level was 0.4, with the reference range being 0.5-1.3. (Tr. 19, 375). The blood was collected eight days after Plaintiff first got his prescriptions. (Tr. 367, 375). The ALJ stated, "If the Plaintiff's testimony [that he took his medication faithfully] were true, his Lithium levels would have been at or above therapeutic readings." (Tr. 19). However,

there is no medical evidence that Plaintiff's lithium level would have been above 0.4 if he had been taking it as prescribed for eight days, and none of Plaintiff's physicians suggested that these lab results suggested he was not taking his medication. Indeed, at Plaintiff's October 2012 appointment, his psychiatrist increased his prescribed lithium dosage, which may suggest that the prescribed amount was too low to begin with. (Tr. 410). It is well established that the ALJ "may not draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000); *see also Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009) (ALJs may not not "play doctor" by "mak[ing] their own independent medical findings") (quotation marks omitted). On remand, the ALJ should ensure that she does not draw her own inferences from Plaintiff's blood test results.

Second, as Plaintiff suggests, the ALJ appears to have relied on some inconsistent statements that either are not inconsistencies or do not actually weigh against the credibility of Plaintiff's complaints. For example, the ALJ noted that Plaintiff had made "contradictory" statements regarding his past suicide attempt and suicidal thoughts, because he told a therapist that he had attempted suicide several years earlier, yet filled out a medical history form on which he checked "no" next to "suicidal thoughts" (along with 21 other physical and mental conditions). (Tr. 246-248). However, it is clear from the medical evidence that the suicide attempt occurred, because Plaintiff was hospitalized for it and the hospital records are part of the administrative record. (Tr. 278-90). Thus, the medical evidence supports, rather than refutes, Plaintiff's claimed mental impairments. Although the Court recognizes that a claimant's inconsistent statements to medical professionals may undermine his credibility, *see Raney v. Barnhart*, 396 F.3d 1007, 1011 (8th Cir. 2005), that is not true of every inconsistent statement. Plaintiff's failure to mention his well-documented past suicide attempt on one check-box form

appears to have been an oversight rather than a deliberate misrepresentation that undermines his credibility.

As "another example of the claimant making whatever statement he felt would be most beneficial to him," the ALJ pointed to a health screening questionnaire in which Plaintiff was asked whether he had ever received treatment for "Skin: any rashes, lumps, dryness, itching, swelling, open wounds, bruise easily, night sweats," and he answered "none," despite the fact that medical records show he had been previously treated for a basal cell carcinoma. (Tr. 19, 365). The Court questions whether this is an inconsistency. However, even assuming that there is any inconsistency there, the Court does not see how Plaintiff's failure to report his history of skin cancer was of any benefit to him. As with Plaintiff's failure to report his past suicide attempt on one form, this omission appears to indicate only that Plaintiff was not always careful to report all of his well-documented past medical conditions, not that Plaintiff had a tendency to make misrepresentations that would bolster his case or that his claimed impairment was unsupported by objective medical evidence.

Third, the ALJ found that Plaintiff's credibility was "eviscerate[d]" by the fact that he "presented himself in the most impaired light possible during the consultative examination [with Dr. Peaco] thereby purposefully attempting to manipulate the disability evaluation system" and that he "consistently changed stories to each doctor he saw." (Tr. 21). It is unclear to the Court what the ALJ's basis for either of these statements is. Dr. Peaco, who examined Plaintiff and found that Plaintiff had severe impairments in social functioning and moderate impairments in his capacity to cope with the world around him, did not suggest that Plaintiff was exaggerating his symptoms or attempting to manipulate the disability system. (Tr. 257-58). In addition, aside

from the aforementioned oversights in filling out medical history forms, the ALJ does not explain how Plaintiff changed his stories to each doctor he saw.

In sum, it appears that the ALJ's credibility analysis relied at least in part on some considerations that are either legally improper or are not supported by the record. When the ALJ reconsiders the evidence on remand, she should ensure that her credibility analysis complies with the relevant regulations and is supported by the evidence in the record.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under 42 U.S.C. § 1383(c)(3) and Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of February, 2015.